Good morning, Your Honors. I'm Michael Drake from the Federal Public Defender's Office here on behalf of Mr. Onwuzulike. Could you keep your voice up? I'm having trouble hearing you. Yes, Your Honor, of course. I guess I'd like to start with laws. This Court made clear in United States v. Culp's that when a sentencing court relies on sample transactions, it has to make sure that the sample is representative. It has to consider the margin of error, and it has to err on the side of caution. Here, in calculating loss, the district court relied on a biased sample. When you make reference to sample, is it really a sample here? It appeared that you may have a dispute as to the tracing of some of the transfers, but there's no extrapolating here. It's just a process of adding, essentially, so how is it a sample? That's right, Your Honor. Samples don't necessarily entail that you're engaging in extrapolation. I use the word extrapolation because government counsel used it down below, but I'm comfortable dispensing with that word. It's an estimate based on a sample because you have specific transactions for which there is evidence of fraud, and from that you're drawing an inference about the entire population of the transactions. So that follows from the definition of the sample. And so because the sample flowed from, presumably, as I mentioned in the opening brief, the fact that people are more likely to call when they've been defrauded than not, the sample is skewed. So the sample is self-selected because it's people who've been defrauded. They've called the government and they've said, hey. How did the district court answer that argument? The district court didn't confront that argument. The argument down below was that. Right, that's what I'm getting at. Okay. The argument down below was that there was no evidence outside of these eight specific individuals that trial counsel, defense counsel mentioned down below. So when I refer to the sample, that's what I'm referring to. The government actually never specified which individuals. It never gave names. It never said how many there were until the modification hearing subsequently. So the argument down below was that, well, the government mentions these 52. They have names with numbers next to them, but there's no evidence. There's no underlying evidence in support of any victims other than these eight. And so that was the argument down below. And the district court's answer to that was what? The district court's answer was there's sufficient evidence, and the district court said I'm incorporating the government's arguments. I don't think the district court meaningfully addressed this issue of this direct challenge to the underlying evidence. For instance, if you look at the record, there are no bank records on the record. There are no e-mails. Inspector Collis, for example, in her affidavit, discusses items seized from the search of the residents in the U.K. But there's no exhibits. There's nothing on the record other than the agents say so. But don't we have the affidavit of the AUSA investigator who identifies these accounts, identifies individuals transferring funds into those accounts? Isn't it a fair assumption at that point that there's nothing associated with these accounts other than fraudulent conduct, and one can then assume that each of those transfers is something that's subject to being deemed a loss? I don't think so, Your Honor. I don't think we can assume anything. I think it's the government's burden to prove that the transactions it wants to count are lost. And what it's done, in effect, is use a sample of transactions, a sample of transactions that are linked to unspecified transactors, unspecified victims. Was there any evidence at all that those transactions were not linked to this? The remaining transactions? Yeah. No. I mean, there's the statement in the record from Anmuzileke when he was in custody in the U.K. That statement, the court can take that for what it's worth. It was just his statement saying that I have a business, a tire business. I sell tires. I deal with clients in Nigeria. They're Nigerian banking. There's no evidence of that. I'm sorry? There's no evidence of that. No, there's no documentary evidence of that. No. So I don't think it's – as the government has effectively conceded, Mr. Anmuzileke didn't have a burden to give any explanation. So I think the government's burden is to prove that these transactions were the result of loss. And I don't think that you can assume or presume or infer that simply because these sample transactions involve – there's no baseline comparison to presume that these other transactions were the result of fraud. Have you made an issue in this case whether or not the MVRA is extraterritorial in application? I mean, you seem to have hinted that on page 39 of your brief, but it's not specified as an issue. And I couldn't find any precise objection to using the MVRA in the fashion that it was used in this case that would violate the statutory language. I do believe I've made the issue. I mean, maybe I'll have to look at the briefing, but we do present that as an issue before the court. There was no objection on that grounds down below, but it's a pure question of law and uncontested fact. So it should just be reviewed de novo. With no objection? With no objection, Your Honor, yes. I mean, that's got to be plain error. How do you get around plain error? You don't identify that in your brief either. Well, it's a pure question of law. Have you read the plain error cases? Yes, Your Honor. I know this because I tried this once and the Supreme Court swatted me down and said, it's plain error, babe, and you have to go through the four steps. But in the opening part of your brief, you don't identify that as an issue either. It just pops up on page 38. That's why I'm asking, is it an issue or isn't it? It's definitely an issue. I intend it to be an issue. So if I haven't adequately briefed it, I certainly apologize. But I do present that as an issue. And if plain error applies, then I think it passes plain error. We have a plain statement from the Supreme Court that says when a statute does not contain a clear indication that it contemplates extraterritorial application, it has none. The MVRA has no clear statement. Under issues presented, I don't see that discussed at all. I didn't state it as extraterritorial. I see the issues in the issues presented. So, yeah, the phrasing in the issues presented was that it was applied to foreign victims with no independent nexus to the United States. So I'm sorry that I didn't phrase it more specifically in terms of extraterritorial application. So continuing the plain error analysis, just to show that the error is clear, the MVRA does not contain a clear statement that it has extraterritorial application, therefore it has none under Morrison. And here the district court ordered a foreign defendant to compensate foreign victims for non-territorial contact. Well, the argument would be, I guess, is that to reach that conclusion requires statutory construction. And it's hard to fault the district court for taking a statute that doesn't on its face apply either way and saying it's plain error. In other words, I guess what I'm suggesting is that even if you're entirely correct, the error may not fall within the plain error standard. Because it requires statutory construction and there's no case law. For example, let's take, if you go above a statutory maximum, certainly that's plain error in sentencing. Right. But I'm suggesting it may not. If it's unclear, then the error is not plain. I'm not aware that there's a per se bar on finding plain error when the error involves statutory construction. There's not a per se bar. I'm just saying that it's not necessarily a pure question of statutory construction. There's a layer of plain error that goes on top of that. So why do you think it's so clear? Because we have a plain statement from the Supreme Court that says that it applies to all statutes. When you have a statute that does not contain a clear indication that it applies extraterritorially, it does not apply extraterritorially. But the MVRA is a remedial provision that's, in this instance, tied to a criminal violation where there plainly is jurisdiction. I mean, there's no doubt, I think, here that the violation that your client, criminal violation that he incurred here, there was indisputably jurisdiction in the district court. So the fact that part of the remedy, you refer to the MVRA, and it happens that some of the victims get recompensed who are outside the United States, how is that really extraterritorial? Because it's really part of really a package of statutory basis that is rooted in jurisdiction here. Well, I think the question is whether the order to compensate these victims is an extraterritorial application. The fact that there is a nexus based on the formal constitution of a scheme doesn't really change that fact, I don't think. Well, why not? I mean, the Morrison case is different. The extraterritorial application in that case is different. It didn't deal with a sentencing provision. Isn't that right? That's right, Your Honor. So, again, going back to Judge Thomas' point, it's hardly clear that there's an error here, much less a plain error. Well, I mean, there's error on the face of the rule. I mean, the rule is a per se rule that applies in all cases, not just – You know, you better go back and read the Morrison case. I mean, a case that says you seem to be mining cases for quotes rather than thinking through the provisions that they're talking about. That never works. I mean, you've mined a quote out of that case, a label, and you've tried to slap it on this, but the case doesn't support it because it's substantially different, as Judge Seaborg pointed out. I grant that it's substantially different. Take a case that's similar. It's substantially different. I mean, that's one of the things you learn in law school. You've got to distinguish between these cases, and the Morrison case doesn't get you there. The quotation that you pull out of the air would seemingly do that, but you can't do that. Well, I think if you look at the Small case, it brings us a little bit closer. The thing about Small is that it shows how broadly the Supreme Court applies this rule. It applies in all cases. Small didn't actually involve an extraterritorial application, but it still considered the rule in the context of the predicate for 922s, the conviction in any court. And it restricted, in light of a number of factors, but including this per se presumption against extraterritorial application. I'm kind of curious. Are you a deputy federal public defender? What's a research and writing attorney, Your Honor? What does that mean? Who hires you? The federal public defender does, Your Honor. You're down to three minutes. I'm down to three minutes. Let me just make one point about obstruction, if I may, if that's possible. It's your time. So on the obstruction point, the 103,000 pounds that Mr. Onwuzlike withdrew from the account was sourced to accounts of which 104,000 pounds was never traced to any individual. So even if this Court finds that loss in the number of victims were legitimate, it should still find there's no support for a finding on obstruction. Well, but whether or not those funds were associated with the fraud, after the London Metropolitan Police give him notice, at that point he can't transfer any funds, innocent or otherwise. He's not allowed to make any transfers, is he? Your Honor, I don't think the Court can rely on Inspector Burke's uncorrupted statement. With respect, I'd like to reserve the rest of my time. Thank you. We'll hear from the camera. May it please the Court. My name is Ellen Lindsey. I'm an assistant United States attorney in Los Angeles. I was counsel below. First, Your Honors, I'd like to really thank you very much for allowing me priority so that I can go back and be available for the Court. If there is a note, I want to thank the people in court who, because we have priority and their reward is seeing my humiliation at my leaving something in the brief on page 56, near the bottom. Have a look. If you haven't seen it already, Your Honors, the head of the appellate section in my office is in court today. With a gun at your back? I'm sorry. I didn't hear that. Go ahead. I didn't hear it. You made a mistake. I did. Well, because in our office, we like to. Just tell us what it is, not why it happened. You mean the exact words that I left in there, Your Honor? You're throwing yourself on the mercy of the Court. What's going on? I am throwing myself on the mercy of the Court. Tell us why. Why what? Why I'm throwing myself on the mercy?  What's the problem? What's the problem? I said rando ass, Your Honors. Oh. Look at the bottom. Yes. Oh, you hadn't seen it. Oops. Well, I just think that I should apologize, Your Honors. I obviously was making a joke with my brief reviewer, and I forgot to take it out. It's completely my fault. I want to assure Your Honors I take this very seriously. But if this is going to happen to anyone, I'm the person for it to happen to. Okay. Let's get to the merits. All right. Your Honors, I just wanted to clear up a few things. First of all, that the sample of people that we interviewed would be skewed. To a certain extent, yes, we hear about victims of these types of crimes. They do call in. But in this kind of international mass marketing fraud, what we're looking for is venue. So what we're looking for, what we're self-selecting for, is people who are in the Central District of California so that we have venue over the cases. To me, and I think what was very important to the court, was not only that it was a significant sample of people, and obviously we would have turned over to the defense if we had found any evidence of a legitimate transfer into those bank accounts. But everybody that we spoke to had been a victim of fraud, and that's what was going into the accounts. What's the basis of making the assumption for those who you did not interview that all the transfers are part of the fraudulent scheme? Well, it was a couple of things, Your Honor. It was, first of all, the overwhelming amount of evidence that was found in Mr. Onwuzaliki's car, in his residence, on his computer, just a flood, a tidal wave, if you will, of evidence demonstrating that this is all that he did was this kind of crime. There was absolutely no evidence of a legitimate income. And then the defendant himself lumped all of the transfers from the United States together by making this statement. And I should also clarify that it was only the first statement that was made in custody, the other statements he was not in custody. And he had a lawyer with him, and he actually, he and the lawyer put together a written statement that they presented and said, every penny that came from America is a part of my legitimate auto parts business, and I'm exporting these parts to Africa, but Africans can't wire transfer money or can't send money to the U.K., so I have to get people in America to pay. I didn't see a shred of documentary evidence to support that claim. Is there any? Well, there is Inspector Burke's lengthy statement. There really was no challenge below to those facts, so we didn't actually put in a lot of exhibits about that. That wasn't the challenge. I mean, from the other side, did he bring in a whole bunch of invoices that showed tires and car parts? Well, no, and as a matter of fact, this was one of the things that he couldn't even name a customer. Right, but your theory of restitution has to rest on the fact that there's no legitimate business. Well, definitely, yes. No, I mean, because otherwise, I mean, you're not, neither of you are arguing sample size, extrapolation, or statistical analysis. You're just saying that here's the money in the account, here are the people who are in the account, and we have to assume that everything is illegitimate. That's your position, right? Yes. Okay. Well, not necessarily. If not, then I think you have problems. Because my problem is with the word assume, because. . . Well, you didn't prove it. We have to infer it. Yes. But you didn't prove it. I just think the fact that the. . . No, a lot of evidence doesn't equate to proof. Okay. Relying on the circumstantial evidence instruction. I just think it was. . . Okay. We didn't. . . It was so overwhelming that the defendant chose to lump it all together. But, yes, I agree. Commingling doesn't get you there either. I mean, it seems to me. . . No. I'm not quarreling with you, but I don't know why you're fighting back on this thing. Your theory has to be that there's no legitimate business. There's no. . . And if there is a commingling, then you have a failure of proof. Is this on the abstract or all of it? Yes. Yes. And I deal with a lot of cases where it's the mass marketing kind of thing and we have hundreds or thousands of victims, so we're very used to not being able to contact everyone. And, for example, when you're doing. . . We don't need to hear about the other cases. You're. . . This is analogous to the no visible means of support argument that's made in many other cases. Yes. The defendant had a ton of money, no visible means of support, therefore proves that it had to have come from drug dealing. Well, and also just the, as I say, the overwhelming amount of evidence that he was so involved in this and his own clumping of all the money together the way he explained it. If Your Honors have any other. . . Well, if we might move to another topic. Yes, Your Honor. Let's talk about the extraterritorial application of the statute. I think on a straight-up analysis, the defense has a pretty good argument on their construction of the statute. And so just leave aside the plain error analysis, which we'll have to deal with. What's your best argument that the statute should apply extraterritorially? I think my best argument, and I believe Judge Seaborg stated it, is that it's not actually extraterritorial because the crime itself is a within, is occurring within the United States when you have a scheme offense like this. No, but I'm talking. . . I mean, I understand that the argument may be, could maybe go to plain error because the court has jurisdiction and the plain error cases talk about the lack of jurisdiction to impose a sentence above a certain statute. But if we're just taking the statute straight up, I don't see how it really applies extraterritorially. Well, there are definitely cases which state that a defendant can be ordered to pay restitution to a foreign victim. But I suppose Your Honor is talking about when the defendant himself is foreign as well as when the victims are foreign. I really think that the best argument there, Your Honor, is that the scheme envelops the United States and it renders it not extraterritorial in the sense of a crime occurring outside the United States and victims outside the United States because these are victims of a crime that did envelop the United States. Isn't your problem, though, that the MVRA is a separate statute? I mean, it may be working in conjunction with the criminal violation, but it's a separate independent act of Congress and there is no indication in that statute of an intent by Congress for it to have an extraterritorial effect. Well, I think literally, yes, Your Honor. I think in every case in which the statute has been interpreted, it has been interpreted as broadly as possible to afford as much recovery to victims as possible. True, but how does that get you from the equally powerful presumption that statutes in the United States don't apply extraterritorially unless Congress specifically says it? Your Honor, and I apologize if I'm not answering you, but I do believe I come back to the fact that this isn't extraterritorial because the offense is within the United States. Do you say that Pasquitino and Doe answer this question? I believe, and I'm trying to turn to that. In your brief? Doing, yes. Page 47 in your brief. Here's an interesting word. You say in that same decision meeting Pasquitino, the Supreme Court so held it recognized that the MVRA could compel payment to a foreign victim. Is that dicta? I mean, what do you mean recognized? Does it recognize a holding? In 100% honesty. We hope you always use 100%. Yes. I don't trust people who say honestly. That means if they don't say it, maybe they're. I was going to say, Your Honor, I am not fully prepared to answer that question, and I would be really more than happy, and I think. We'll answer it. Yeah, I bet you will. In the time remaining. I would ask, because there's people in my office who are a lot smarter than I am and more familiar, I would ask to be able to submit a 28-J letter that specifically addresses that particular issue, because I am not really fully knowledgeable about the area of law. I apologize. I should be, because it's in my brief. Well, it was raised in the appeal, and you answered it in your brief. That's the time to raise it. Yes, Your Honor. And I totally. May I turn to a different topic? Of course. On the number of victims, you claim there are 52, right? Well, yes, although. Where do you get that? We get that from the bank records and from the known victims that we have. Your brief cites the PSR, of course, and they objected to that, so that's not evidence. And then it also cites the affidavit, and I just don't see the number 52 in the affidavit. Well, I believe that the judge resolved it in the government's favor, and what it would be is a list of victims that would accompany the PSR, and it may not be part of the record, but. Right, but they objected to the PSR. There may be, basically, that's what you've got. I believe that. Because the citations in your brief did not lead me to anything that said 52. Well, as I said, Your Honor, I believe the PSR said 52, and then the arguments. Right, but the PSR, they objected to the PSR, so that's not, we can't take that as evidence. Well, but what I was going to say is that I think that the court then, the objections to the PSR were based on the same arguments. It was all rolled up into one with the loss argument, and that our argument regarding the loss, I mean, their argument about the number of victims was you can't, they didn't say, no, you're wrong about 52 people transferring money, and so that wasn't their argument. Their argument was you can't say that those 52 people who transferred money were victims because you can't extrapolate. I'm talking about your proof, not their objection. Well, but what I'm. So you're down to the list that's in the PSR, but that's unauthenticated, right? Well, I think it is because I think that the government answered the defendant's objection, which I do believe was all rolled up in the loss argument. And so when the court found that it agreed with the government, it was agreeing not only on the loss figure, but also that you could count all 52 of those. No, I understand that the court did that. I'm trying to peel back the onion a bit and see where your proof is. Just the fact that the court said, I made the finding, doesn't help me because I'm trying to figure out what your proof was. And I gather what you're saying, if I'm distilling it correctly, the only thing you have is the list that's attached to the PSR. And that is true, Your Honor, and I believe. Because there's nothing in the affidavit that says 52 victims. Well, I think what it is is it's the nature of the defendant's objection, which I can't think of the right word here, which caused the nature of the government's response because there was never an objection to the number 52 as a number of transfers going in, as a number of separate people. The objection was, yeah, there's these 52 who transferred money in, but you can't say they're all victims of fraud because there was not enough evidence supporting it. So I guess what I'm saying is because of the 52, is that what you're saying? Their objection presupposed that the 52 was correct, but said you can't say that they're all victims of fraud because, you know, you only interviewed eight, and we can't extrapolate that all of those transfers were fraudulent. So it was not a question of numbers. It was a question of what you do with those numbers. So I believe that the challenge wasn't to that actual just addition in the PSR. It was the nature of what made up those 52. And that's why we didn't say, well, here's the 52. So are you saying you didn't put on the proof because they didn't object? They didn't object on that issue. No, Your Honor. I don't think they did. All right. Your time has expired unless there are more questions. Have you read Pasquantino? I probably did when I wrote the brief, Your Honor. Because in that case the court specifically says we're not applying this statute extraterritorially, so it's not an issue. And in Doe there was a concession at the trial level that it could apply, and the court we simply mused this is the first time we've ever seen this. It wasn't a holding. And that's why I was asking, Your Honor, if I could get somebody smarter than me to give you some additional guidance on that. Thank you very much, Your Honor. Rebuttal. Well, I think the simplest way to just distinguish Doe and Pasquantino is that they both involved U.S. citizen defendants. How about the 52? You heard what the other side said. So the defense counsel objected to the list. He said that there's just a list with names. And he objected in briefing. He objected at the sentencing hearing. So there was an objection to the list. I think probably it's fair to say that there wasn't a specific objection to the number, but he objected to the list and said there's no evidence. There's not enough evidence. There's, like, no showing. It doesn't specifically scare me because they're kind of weasel words. It wasn't a specific objection. Either there was or there wasn't. Well, the government's saying that there was no objection to the list, and we certainly did object to the list below. Right. But what we're talking about is the enhancement for over 50 victims. Did you object to the fact that there weren't more than 50 victims? Defense counsel objected to the fact that there was not enough evidence to support 52 victims. And where is that in the record? Give us a pinpoint site so we can check that out. Could I get that to you after the hearing? Would that be all right if I sent a letter to the court? Sure, Senator. Give us the 28 chain. Yeah. Okay. Anything further? No, Your Honor. Okay. Thank you. Thank you. The case just heard will be submitted for decision. Thank you both for your arguments. And we'll proceed with oral argument on Velazquez v. Barrios. Thank you. Thank you.
judges: Seeborg, Trott, Thomas